UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 JUL -6 PM 1: 35

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| AMY ROONEY,<br>　　　　*Plaintiff*<br><br>　　v.<br><br>THE UNIVERSITY OF VERMONT<br>MEDICAL CENTER<br>　　　　*Defendant* | Case No. : **5:18-cv-109** |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1. Plaintiff, Amy Rooney ("Plaintiff" and "Ms. Rooney"), is an individual residing in Plattsburgh, New York.

2. Defendant, The University of Vermont Medical Center ("UVMMC") is a Vermont corporation having its principal place of business in at 111 Colchester Avenue, in Burlington, Vermont.

3. Plaintiff reserves the right to add additional employees of UVMMC operating in their individual capacities.

### JURISDICTION & VENUE

1. Jurisdiction is conferred upon this court by federal question jurisdiction, 28 U.S.C. § 1331 as well as 28 U.S.C. § 1343 (a)(4). Supplemental jurisdiction is conferred upon this court over State law claims by virtue of 28 U.S.C. § 1367. This court also has

1

diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and the amount in controversy exceeds $75,000.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) as Defendant is a Vermont corporation, and the acts, errors and omissions giving rise to the claims occurred in this District.

3. This action arises under 42 U.S.C. 126 §§ 12101 *et seq.*, the Vermont Fair Employment Practices Act 21 V.S.A. §§495 *et seq.*, the Fair Credit Reporting Act 15 U.S.C. §§ 1681 *et seq.*, and common law.

4. Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), and is timely filing this action within 90 days of receiving from the EEOC a Notice of Right To Sue, dated May 31, 2018. (See **Exhibit A** attached hereto and incorporated by reference as if set forth in full).

## FACTS AND ALLEGATIONS APPLICABLE TO ALL COUNTS

1. Plaintiff is a Registered Respiratory Therapist, and was hired by Defendant in September 2009.  Plaintiff has at all times up to her termination in February 2017 met the definition of "employee" under 42 U.S.C. 126 §12111. Plaintiff was Registered Respiratory Therapist Level III when Defendant terminated her employment.

2. Defendant is a Vermont corporation employing 15 or more employees.

3. Plaintiff was an excellent respiratory therapist with advanced critical care skills. She regularly took charge responsibility for the department on night shift. She was well-liked and well-supported by her coworkers. She regularly received excellent

performance reviews, and compliments from coworkers and her management team. Prior to the events from which this claim arose, Plaintiff was a content employee in her department, a resources for her peers, and a senior therapist on the night shift. She did not have any performance-related issues, and was highly clinically competent and a valuable member of her department.

4. Plaintiff developed symptoms of median nerve compression in her right arm in 2013. This condition was exacerbated during subsequent winter busy seasons when hospital admissions for pulmonary infections are most frequent. With routine care (ice, splint, stretches) it would improve during the summers.

5. The condition caused pain and numbness that became unrelenting in December 2014. Plaintiff sought medical treatment and an orthopedic specialist referral in January 2015. She continued to work through the busy flu season while undergoing treatment.

6. At this point, Plaintiff was disabled; she had a physical impairment that substantially limited a major life activity.

7. In May 2015, Plaintiff notified her employer of her injury and underwent steroid injection therapy.

8. Plaintiff was now also "regarded as" someone with a physical impairment that substantially limited a major life activity, and had a record of having such an impairment.

9. After a two-week medically excused absence, Plaintiff was released back to work on May 31, 2015 by her orthopedist with one restriction: "No Manual Chest

Physiotherapy". Manual chest physiotherapy is a specific pulmonary physical therapy that entails continuously and rhythmically striking a patient with cupped hands in an effort to assist airway clearance for retained lung secretions. It is most frequently prescribed for cystic fibrosis patients four times daily, and infants with Respiratory Syncytial Virus every two hours. This therapy required repetitive direct impact to Plaintiff's hands and wrists, causing inflammation as evidenced by swelling, redness, tingling, loss of sensation, and acute pain. Plaintiff was able to perform all other job functions.

10.  Plaintiff was prepared to return to work on May 31, 2015 as scheduled with that one work restriction.

11. On May 25, 2015 Plaintiff received a phone call and email from Respiratory Care Department Manager, Bradley Holcomb ("Manager") advising her not to return to work. She was told that unless she could perform "every single job function listed in her job description" she could not return at all. Plaintiff was well aware of her rights, and specifically requested in writing accommodation under the Americans with Disability Act ("ADA") and concurrent state law.

12. Plaintiff offered to change shifts, change hours, change assignments, exchange patients with other therapists, and take additional work to make up for any possible inconvenience. None of these solution presented any undue hardship for Defendant. Plaintiff's request for reasonable accommodation was denied. Manager, Human Resources Employee Relations staff, and all members of the chain of authority all the way up to and including the Vice President of Human Resources, Laurie Gunn were

all aware of this situation. The complaint was forwarded to the office of the CEO, John Brumsted. Nobody intervened.

13. Plaintiff was involuntarily placed on Family Medical Leave and complied with all FMLA leave documentation requirements.

14. On July 1, 2015, Plaintiff underwent a nerve conduction study which unequivocally confirmed her diagnosis of moderate to severe median nerve compression. Surgery was advised, with medical management to continue until a surgery date became available.

15. On July 7, 2015 Plaintiff was contacted by Manager, and advised that her allocated FMLA leave time was about to elapse, and her employment would be terminated unless she could return to work with no work restrictions. Plaintiff specifically repeated her request for accommodation under the ADA, and contended that her work restriction did not preclude her from performing any essential job functions. Plaintiff also repeated her offer of several no-cost solutions that would not cause UVMMC any undue hardship. This request was again made in writing, specifically quoting the relevant federal law and requirements. This email was copied to every member of management chain up to and including the Vice President of Human Resources, Laurie Gunn.  Again, the whole entire management team was made aware of this request for accommodation, nobody intervened.

16. Plaintiff's second request for reasonable accommodation was denied. She was told they "didn't want to shift her work onto anyone else", or "set a precedent for making

special arrangements for people". No alternatives were accepted. No conversation or negotiation took place at that time.

17. Plaintiff's FMLA leave time elapsed, and she remained on "unspecified unpaid leave". Her employment was not terminated, and she did not at any time resign or give any indication that she would resign or abandon her position. She continued to pay for coverage under UVMMC's health insurance plans, although she was not receiving an income. Human Resources benefits coordinators told Plaintiff to file for disability insurance and worker's compensation. Plaintiff refused to claim total disability, and requested again to come back to work. Her request was denied. She remained unpaid.

18. On July 15, 2015 Plaintiff filed her first Charge of Discrimination with the U.S. Equal Employment Opportunity Commission's ("EEOC") Boston office for failure to provide reasonable accommodation of a documented disability.

19. Ms. Rooney was from May 2015 to August 2015 not paid any sort of income. She incurred significant amounts of debt during this time.

20. On July 18, 2015, 64 members of the Respiratory Care Department signed and submitted a petition asking Manager Holcomb to allow Plaintiff to return to work. This number represented all active members of the department who were not out on leave or on vacation at the time. Their petition was ignored.

21. As it became obvious that UVMMC was not going to discuss a reasonable accommodation, Plaintiff focused on getting approval for surgery with hopes that it would cure her condition and enable her to return to work with no restrictions. She was advised again by Human Resources to file a Worker's Compensation with

Compensation Consultants, Inc (UVMMC's Worker's Compensation Carrier) and Short Term Disability insurance claim with UNUM, Inc. (UVMMC's Short Term Disability carrier).

22. Plaintiff, applied for both Worker's Compensation and Short Term Disability as instructed, and made plans to secure a September 1, 2015 surgery date. In preparation for surgery, Plaintiff completed another round of FMLA documentation, and UNUM's short term disability medical documentation that would support her post-surgery claim for time off.

23. In August 2015, Plaintiff's Worker's Compensation claim was denied by UVMMC's insurance carrier. Her surgery date was canceled.

24. Plaintiff then started over again and made alternate arrangements for surgery pre-approval through her private insurance carrier. By the time that was completed, the earliest surgery date that was available was October 28, 2015. Plaintiff scheduled her surgery for that date.

25. In September 2015, Plaintiff was contacted by Kelly Ashline, UVMMC Employee Relations Manager. (The HR representative who had been previously handling the case had left the company). Ms. Ashline assured Ms. Rooney that she was conducting an investigation about how Ms. Rooney had been treated. Ms. Ashline assured Plaintiff that her employment would not be terminated in the meantime. Ms. Ashline offered support and agreed to keep Plaintiff informed of any developments.

26. Ms. Ashline was at all times an employee and authorized representative of UVMMC. She conferred on all matters with her senior leadership, and her actions at no time

exceeded her scope of employment. Ms. Ashline's interactions with Plaintiff were specifically of the kind Ms. Ashline was employed to engage in, they occurred substantially within authorized time and place of her employment, and they were actuated in furtherance of UVMMS's business interests.

27. In September 2015, Ms. Ashline contacted Plaintiff. Ms. Ashline emphasized that Plaintiff was a valuable asset, and asked Plaintiff to consider returning to her position. Plaintiff agreed to consider it.

28. On September 15, 2015, Plaintiff contacted Ms. Ashline via email, thanked her for the invitation, but explained that she would not be coming in for a meeting unless she would be made whole for her losses during her ordeal. Plaintiff specifically stated in her email:

> "Realistically, I would want to be put back in a position similar to where I would be had I been reinstated properly, plus compensation for the time I have had to spend pursuing this, and the physical, emotional and financial toll this ordeal has taken on me and my family…. I think if I received a decent offer, and I felt that all the logistical pieces could be taken care of (FMLA rollback, CTO accrual, etc.) I think we could wrap this up this pretty easily."

1. Ms. Ashline represented that these conditions would not be a problem and that Plaintiff should come in right away to meet with Ms. Ashline and Manager. Plaintiff agreed.

2. Plaintiff met with Ms. Ashline and Manager the next week. The meeting was productive and arrangements were begun to have Plaintiff return to her position in the department.

3. On October 12, 2015 Plaintiff, Ms. Ashline and Manager agreed on the specific date on which she would return after surgery. Plaintiff inquired about the status of her

8

compensation that was due. Ms. Ashline replied that she was "scheduling time with benefits this week to work through all the moving pieces"

4. Plaintiff had decompressive surgery on October 28, 2015. The surgery was successful and Plaintiff made a complete recovery.

5. In November 2015, Plaintiff contacted Ms. Ashline about her compensation due. She did not receive a reply.

6. In November 2015, Elizabeth Marcus, Esq. from the EEOC was appointed as the mediator assigned to Plaintiff's pending EEOC charge of discrimination. Plaintiff waived mediation and opted to proceed with the EEOC investigation and conciliation process. The charge was assigned to Federal Investigator Scott Kelley in the Boston EEOC office.

7. On December 15, 2015, Plaintiff returned to work with no restrictions as agreed. She resumed her former role with no difficulty.

8. Plaintiff inquired a second time about her compensation due. Ms Ashline replied that it was "taking a while to put together all the moving pieces".

9. In late December 2015, Ms. Ashline left UVMMC.

10. Plaintiff's further inquiries about the status of her back-wages and other compensation went unanswered.

11. In January 2016, UVMMC received the EEOC Notice of Charge. In their official written Respondent Position Statement, UVMMC brought no objection to the issue of whether the plaintiff was a person with a disability.

12. UVM also admitted that they did not follow their organizational policy.

13. UVM also admitted that they denied Plaintiff a reasonable accommodation.

14. On February 11, 2016, the EEOC issued a "Final Determination" on Plaintiff's charge (See **Exhibit B** attached hereto and incorporated by reference as if set forth in full). They determined:

> "The Commission's investigation reveals that Charging Party could have performed the essential functions of her position with a reasonable accommodation. However, Charging Party was not granted a reasonable accommodation for her disability and was placed on a medical leave of absence because of her disability. Based on the above and the Respondent's admission of failing provide a reasonable accommodate [sic]  to Charging Party, the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party on the basis of her disability."

15. In February 2015, Plaintiff and UVMMC were referred to the EEOC's conciliation process.  Plaintiff asked for UVMMC to honor the compensation agreement made as a condition to her re-assuming her position at UVMMC. UVMMC's representative refused. Investigator Kelley failed the conciliation and closed the matter.

16. At no time since has UVMMC made any offer of any sort of compensation to Plaintiff.

17. In late February 2016, Plaintiff became very despondent about UVMMC's refusal to properly compensate her. Although Plaintiff gave re-assumption of her position a real effort, and hadn't had any actual performance issues, her relationship with her management team was greatly damaged and she didn't trust the situation. She felt that she was taken advantage of, and experienced symptoms of severe anxiety and depression.  Ms. Rooney requested to change her employment status from part-time

employee (scheduled 24 hours per week) to per-diem employee (no regularly
scheduled hours) in order to stay active and preserve her seniority within the
department while she figured out what to do.  Her request was granted. Her last
scheduled shift as a part-time employee was March 10, 2016.

18. One March 28, 2016 the EEOC issued a "Notice of Conciliation Failure" and issued
Plaintiff a "Notice of Right to Sue" (See **Exhibit C,** attached hereto and
incorporated by reference as if set forth in full) noting that the EEOC "found
reasonable cause to believe that violations of the statute(s) occurred… but could not
obtain a settlement".  Plaintiff had exhausted all administrative remedies that were
available at that time.

19. During this protracted ordeal, Ms. Rooney's anxiety and depression worsened. She
was ultimately medicated once attempts at traditional self-care failed.

20. Plaintiff was unable to secure the financial backing, nor the mental resilience needed
to file suit in federal court within 90 days as required by the EEOC's March 2016
Right To Sue Letter. She consulted with local counsel who told her she still had
remedies available under state law, and advised her to consider that jurisdiction. She
remained despondent during the summer of 2016, and did not pick up any shifts at
UVMMC. However, she complied with all work related requests and completed all
departmental continuing education requirements.

21. Despite previously insisting that chest physiotherapy was an essential job function,
UVMMC completely discontinued the routine performance of manual chest

physiotherapy by all Respiratory Care department employees during the summer of 2016.

22. Plaintiff reported to work as requested for her annual performance evaluation in August 2016. At Manager's request, her immediate supervisor, Christopher Chambers ("Supervisor") told her that she wasn't getting her traditional performance evaluation as she had every past year for 6 years. Supervisor told Plaintiff they "weren't doing them anymore", and "moving away towards a different system of more frequent feedback". Plaintiff was told that completing the normal self-evaluation was unnecessary. She was not given any written documentation of her performance.

23. Supervisor noted no issues with her work performance, or any other work issues.

24. Supervisor asked when she would begin to schedule shifts again. Plaintiff replied that she intended to return in November 2016.

25. Supervisor specifically stated that he had looked at Kronos (the hospital's timekeeping software) and Plaintiff had already accumulated around 120-150 hours since she had already worked January through March that year as a scheduled part-time employee. He added that returning in November would allow plenty of time to complete the requirement of working 300 annual hours as a per-diem employee. No objections were made to her returning in November. Plaintiff agreed and left.

26. Plaintiff relied on the agreement that she would return in November.

27.  Unbeknownst to Plaintiff at the time, all employees in the Respiratory Care Department, other than Plaintiff, received regular traditional written performance

reviews that year 2016 detailing their accomplishments. This practice endured for the 2017 year as well.

28. Plaintiff was very disappointed when she found out from colleagues that she was being singled out and deprived of performance evaluations that would provide documentation of her positive performance. Plaintiff had worked to maintain a good relationship with Supervisor. She had previously given him the benefit of the doubt, justifying that the prior decisions about her mistreatment made were "above his paygrade". Yet, she was faced with the reality that he had blatantly lied to her face.

29. In late October 2016, with mounting debt and no other choices, Plaintiff returned to work as agreed.

30. On November 9, 2016, Supervisor sent an email to her advising her that under different pro-rated accounting methods, Plaintiff actually only had worked 40 hours for the 2016 calendar year, not 120-150 as previously agreed. Supervisor said that Plaintiff would need to work 223 hours during the remainder of 2016. He did not count any of the hours Ms. Rooney worked as a part-time employee from January 2016-March 2016. Supervisor added "Let me know if you have any questions."

31. On November 10, 2016 at 8:53pm, Plaintiff replied to Supervisor's email "when I had my review, I was under the impression I was at 120-ish hours or something which is way off from this. (?)"

32. Supervisor never replied to Plaintiff. Nothing else was said to her about the matter by anyone for the rest of the year. Plaintiff never received an official verbal or written warning or any sort.

33. On November 10, 2016 at 9:24pm, Plaintiff asked the scheduling secretary for a list of all available shifts for the rest of the year. When the scheduling secretary replied, Plaintiff picked up all the available open shifts remaining for the rest of the year.

34. Plaintiff's supervisor did not tell her that she needed 223 more hours until it was impossible for her to complete that feat.

35. Plaintiff made every possible effort to work as many hours as possible in 2016 once she was advised that her management team had pro-rated her hours differently than expected. Plaintiff also picked up shifts that she begged off her co-workers, and worked extra holiday hours including Christmas Eve.

36. Other per-diem co-workers had worked fewer than 300 hours per year in the past and were not disciplined at all in the past.

37. In a particularly similar case that previous year, another co-worker worked January 2015 through March 2015 as a regularly scheduled employee. He changed status to a per-diem employee, moved to another state for more than a year, and did not work a single hour as a per-diem employee for the rest of the calendar year. He came back to a full-time job the following year with no disciplinary action and full seniority intact.

38. January 1, 2017 came and went without incident. Plaintiff scheduled her nightshifts directly with the department secretary for every other weekend as usual (24 hours every other week).

39. On January 31, 2017, Manager emailed Plaintiff saying that he needed schedule a meeting with her to discuss her per diem hours commitment for 2016 and to please coordinate if she would like a union steward to attend. This was standard request for

14

any disciplinary action, and Plaintiff anticipated getting a warning. Plaintiff was
disappointed and felt it unfair, but would comply. Plaintiff's next schedule shift
wasn't until February 11, 2017.

40. On February 8, 2017 at 4:20pm Manager Holcomb called Plaintiff at home and fired
her over the phone for not meeting the minimum annual hours requirement as a per-
diem employee. No performance or other issues were supplied as a justification. A
union steward was present at the time of the phone call.

41. No other department employee has ever had their employment terminated for not
meeting a per-diem hour requirement.

42. There was no contractual requirement for Manager to fire a per-diem employee not
meeting annual hour requirement. Manager's decision to do so was completely
elective.

43. At the time of Plaintiff's termination, it was well known to management that five
other women in the department were due to be going on maternity leave within the
next five months. Short-staffed conditions for spring/summer 2017 had been
predicted months before Plaintiff's employment was electively terminated.

44. Employment agencies were contracted to supply traveling therapists as temporary
staffing help in during that ensuing time of short staffing the spring/summer of 2017.

45. Those agencies charged twice the rate of Plaintiff's hourly salary. There was a strong
financial incentive to minimize the use of agency staff. Manager willfully forwent that
incentive in order to electively terminate Plaintiff's employment.

46. It is extremely rare for anyone in the UVMMC Respiratory Care department to be terminated, even for gross misconduct, without a prior verbal or written warning. There have been cases where poor employees with extensive histories of behavioral problems have assaulted co-workers, screamed at family members, sexually harassed students, cursed out doctors, disobeyed orders, abandoned their patient assignment, not shown up for work – yet they have been afforded multiple warnings and probation.

47. Defendant's pro-offered reason for terminating Plaintiff's employment was clearly a pretext for retaliation for filing her EEOC charge for discrimination.

48. Plaintiff persevered in the face of frank discrimination and retaliation for more than two years. She accepted egregious mistreatment and amicably returned to that department twice in an effort to retain her career.

49. Plaintiff considers UVM Medical Center hospital system, with its current management team, to be a hostile working environment. Even if she were eligible for rehire, it would not be reasonable for her to be expected to return under these circumstances. Defendant has made it clear that they do not respect federal employment laws and retaliate against those who exercise their rights as afforded by those laws; it would be a futile gesture. Plaintiff has reasonable fear of having her professional license intentionally sabotaged, which would preclude her from working in a licensed profession anywhere in the country.

50. Due to a trend of recent consolidation in the regional healthcare industry, all hospitals within a reasonable commute of one hour/60 miles from her home are now

owned by the UVM Medical Center hospital system. Plaintiff would have to sell her house, uproot her family and relocate at least 2.5 hours away in order to work in an equivalent position with for another hospital system other than UVMMC.

51. In Fall 2017, Plaintiff filed a second Charge of Discrimination for retaliatory wrongful termination, this time with the Vermont Office of the Attorney General - Civil Rights Unit.

52. In January 2018, Plaintiff was notified by a representative of the Attorney General's office that ultimately they decided to refer the charge back to the Boston EEOC office because the Boston EEOC had handled the first investigation and had issued the original finding of reasonable cause for discrimination.

53. On May 31, 2018, upon Plaintiff's request, the Boston EEOC office issued a second Right To Sue letter for Plaintiff's retaliation/wrongful termination claim and all other related claims (Exhibit A). A copy of this was forwarded to UVM Medical Center's Legal department.

54. In June 2018, Plaintiff suddenly began receiving notices and calls from collection agencies. UVMMC referred Plaintiff's bills from her October 2015 nerve decompression surgery to collections. These bills had been paid in full. After more than two years of no contact about any pending bills, the injury was mysteriously re-classified as a Worker's Comp injury and all prior private insurance payment was voided. The new collections effort closely coincided with delivery to UVMMC of Plaintiff's Notice of Right To Sue dated May 31, 2018 sent by the Boston EEOC office.

55. Plaintiff's worker's compensation claim was denied back in 2015 and UVMMC was well aware of that. Plaintiff asked UVMMC's collection agencies to send debt verification requests to UVMMC. The requests were answered by UVMMC with an explanation that UVMMC did indeed authorize the accounts sent for collection; it was not the agency's error. A written cease and desist notice with full documentation of Worker's Comp denial has been sent to both UVMMC and the collection agencies via certified mail. At UVMMC's request, collection agencies continue to harass Plaintiff about bills she isn't clearly isn't responsible for. Plaintiff's credit has been seriously damaged, affecting eligibility for loans that would fund this litigation.

## COUNT I
## DISABILITY DISCRIMINATION AND
## FAILURE TO MAKE REASONABLE ACCOMODATION
## UNDER THE ADA 42 U.S.C. 126 §12112

56. Plaintiff repeats each and all of the allegations set forth hereinabove.

57. Defendant discriminated against Plaintiff, and admitted in their Employer Position Statement to the EEOC that they refused to make a reasonable accommodation for Plaintiff's disability.

58. The EEOC subsequently found reasonable cause to believe that Defendant discriminated against Plaintiff, and that Defendant failed to make a reasonable accommodation for Plaintiff's disability.

59. Plaintiff asked for reasonable accommodation on two separate occasions, specifically quoting and referencing the requirements of Americans with Disabilities Act ("the

ADA") both times. Plaintiff specifically told the Defendant that their actions were in
direct violation of the ADA both times.

60. Defendant is the largest employer in Vermont, and employs many professionals in
the legal and human resources departments who should have basic knowledge of
federal discrimination laws. All of the individuals in the management chain, from
Manager Brad Holcomb up to and including the VP of Human Resources Laurie
Gunn, were made aware on two separate occasions that that illegal discrimination
against Plaintiff was occurring. The CEO, John Brumsted,'s office was also made
aware. Defendant acted with direct knowledge they were violation of an anti-
discrimination law, willfully discriminated against Plaintiff, and admitted it in their
Respondent Position Statement to the EEOC. Despite this frank documented
admission, they continue to flaunt these laws and refuse to pay out just compensation
to someone they willingly discriminated against.

61. In consequence of its failure to meet its obligation, and its reckless indifference to the
law, the Defendant is liable to the Plaintiff for compensatory damages, punitive
damages, all costs and fees, including both pre-judgement and post-judgement
interest and compensation for negative tax consequences for violation of 42 U.S.C.
126 §12112, discrimination on basis of disability and failure to provide reasonable
accommodation.

**COUNT II**
**DISABILITY DISCRIMINATION AND**
**FAILURE TO MAKE REASONABLE ACCOMODATION**
**UNDER 21 V.S.A §§495 *et seq.***

62. Plaintiff repeats each and all of the allegations set forth hereinabove.

63. Defendant discriminated against Plaintiff, and admitted in their Respondent Position Statement to the EEOC that they failed to make a reasonable accommodation for Plaintiff's disability.

64. The EEOC found reasonable cause to believe that Defendant discriminated against Plaintiff, and that Defendant failed to make a reasonable accommodation for Plaintiff's disability.

65. In consequence of its failure to meet its obligation, its reckless indifference to the law, and willful discrimination, the Defendant is liable to the Plaintiff for compensatory damages, punitive damages, all costs and fees, including both pre-judgement and post-judgement interest, compensation for negative tax consequences under 21 V.S.A §495, for discrimination on basis of disability.

## COUNT III
## BREACH OF CONTRACT AND UNJUST ENRICHMENT

66. Plaintiff repeats each and all of the allegations set forth hereinabove.

67. Plaintiff and UVMMC, through its representative Ms. Kelly Ashline, entered into a contract under which Plaintiff agreed to resume her previous position if UVMMC agreed to pay compensation due to Plaintiff, to put her back in a position similar to where she would be had she been reinstated properly, plus compensation for the time she had to spend pursuing this matter, and the physical, emotional and financial toll this ordeal has taken on her.

68. Plaintiff re-assumed her position as agreed in December 2015. Plaintiff was aware she resumed all duties at that time.

69. As a direct result of their contract, Defendant induced Plaintiff to rejoin her department cooperatively (as opposed to resigning, or requesting a different but equivalent position be found for her), and enjoyed the great benefit of Plaintiff's labor during the busy holiday and influenza season December 2015 through March 2016.

70. Defendant has had many opportunities, including EEOC conciliation, to settle this matter and fulfill its obligations to Plaintiff.  Defendant has refused to do so.

71. As a direct and proximate result of Defendant's breach, Plaintiff suffered and will continue to suffer economic damages. Defendant is liable for those damages.

## COUNT IV
## BREACH OF COVENANT
## OF GOOD FAITH AND FAIR DEALING
## RE: PROMISE TO PAY

72. Plaintiff repeats each and all of the allegations set forth hereinabove.

73.  A covenant of good faith and fair dealing was implied in the aforementioned contract entered into by and between Plaintiff and Defendant when Defendant promised to fully compensate Plaintiff if she would return to work.

74. Defendant's conduct, including refusal to pay Plaintiff damages as discussed constitutes a material breach of the covenant of good faith and fair dealing.

75. As a direct result of Defendant's breach of the covenant of good faith and fair dealing, Plaintiff has suffered and will continue to suffer economic damages.

## COUNT V
## DEFAMATION

76. Plaintiff repeats each and all of the allegations set forth hereinabove.

77.  Defendant (Manager, Human Resources personnel, Risk Management, other and senior managers in the organization acting within their scope of employment) intentionally and negligently made false and defamatory unprivileged statements by about Plaintiff by verbal and written publication to third parties. Statements indicated that Plaintiff was unfit for her occupation, and defamed her character. They defamed her morality by insisting that she was faking her injury, even after objective medical testing determined she had moderate to severe nerve damage.

78. As a direct result of Defendant's tortious actions, Plaintiff has suffered and will continue to suffer economic damages.

## COUNT VI
## BREACH OF COVENANT
## OF GOOD FAITH AND FAIR DEALING
## RE: AGREEMENT ON HOURS/SCHEDULE

79. Plaintiff repeats each and all of the allegations set forth hereinabove

80. Supervisor willfully misrepresented to Plaintiff that "we don't do them anymore" when she asked about her written review during her August 2016 performance review meeting.

81. In the same meeting, Supervisor and Plaintiff agreed she had plenty of hours already put in for the year after working January- March 2016, and it would be fine for her to return in November 2016 to complete the rest.

82. Plaintiff relied on that understanding to her detriment; had she been told in August she had to work an additional 223 hours, she would have made different plans and

started picking shifts earlier. There was no indication that she had not complied with any prior departmental request.

83. Supervisor was aware that they had this understanding, and knew when he informed Plaintiff that the hours had been accounted differently, it would be a problem.

84. Plaintiff questioned the new pro-rated amount and Supervisor ignored her inquiry.

85. Supervisor and Manager both allowed Plaintiff to scramble to try to cover more shifts, took advantage of her good faith effort to comply with unrealistic requirement, knowing that Manager was going to fire her anyway. The department enjoyed her labor during the busy holiday and flu season.

86. Had Supervisor replied truthfully to Plaintiff's inquiry on November 10th about the accounting of the hours and told her that their intention was to fire her if she didn't come up with 223 more hours, Supervisor know there was a possibility that Plaintiff might quit and not spend her holiday season working towards an unachievable requirement. Instead he remained silent so that Plaintiff would continue to work through the holidays.

87. Even if Supervisor made an honest mistake or misunderstanding about the accounting of Plaintiff's hours, both Manager and Supervisor knew that they didn't tell Plaintiff she needed to work 223 hours until so late in the year it was impossible to accomplish that.

88. Supervisor and Manager also both knew that there was strong department precedent for not disciplining employees for not meeting minimum annual requirements.

Plaintiff would not have any reasonable expectation that her employment would be terminated, and Supervisor didn't do anything to change that expectation.

89. Being fully aware of these factors, Manager and Supervisor essentially created a situation where Plaintiff was guaranteed to fall short, ignored that others in the past had also fallen short without consequence, and then fired Plaintiff who had no reasonable expectation she would be fired. Manager's elective decision to terminate Plaintiff's employment was particularly petty, unfair, cruel and abusive behavior. This behavior was designed to punish, embarrass and inflict emotional distress on Plaintiff. It was also designed to intimidate other members of the department.

90. Had Manager been dealing in good faith, he would have acknowledged the miscommunication, possibly given Plaintiff a warning for next year, and let the matter go. Instead he seized upon a trivial technicality as an opportunity to get rid Plaintiff.

## COUNT VII
## RETALIATION IN VIOLATION OF
## THE ADA 42 U.S.C. 126 §12203

91. Plaintiff repeats each and all of the allegations set forth hereinabove.

92. Plaintiff opposed Defendant's unlawful, discriminatory employment practices. She engaged in protected activity by filing a Charge of Discrimination with the EEOC, and the EEOC found reasonable cause that she was discriminated against.

93. Defendant deprived Plaintiff of her annual written performance review, and terminated Plaintiff's employment in retaliation for engaging in that protected activity.

94. Even if Defendant was to claim that it had a legitimate non-discriminatory reason for firing Plaintiff, there are many facts surrounding the termination of Plaintiff's employment overwhelmingly indicate that it was a pretext firing.

95. Defendant's illegal retaliation against Plaintiff not only was designed to punish Plaintiff, but was also designed to send a clear message to all other department staff members that "this is what happens when you resist".  Defendant's retaliation against Plaintiff has had a chilling effect and still interferes with individuals who would otherwise seek to exercise their rights in direct violation of 42 U.S.C. 126 §12203 (b), There were several other individuals in that department who had sustained chronic injuries who were dissuaded from complaining or asking for accommodation after they saw how Plaintiff was treated.

96. As a result of Defendant's retaliatory termination, Plaintiff has suffered substantial additional damages, on top of the uncompensated damages from the original discrimination charge.

## COUNT VIII
## RETALIATION
## IN VIOLATION OF 21 V.S.A §§495 *et seq.*

97. Plaintiff repeats each and all of the allegations set forth hereinabove.

98. Plaintiff opposed Defendant's unlawful, discriminatory employment practices. She engaged in protected activity by filing a Charge of Discrimination with the EEOC, and the EEOC found reasonable cause that she was discriminated against.

99. Defendant deprived Plaintiff of her annual performance review, and terminated Plaintiff's employment in retaliation for engaging in that protected activity.

100.     Even if Defendant was to claim that it had a legitimate non-discriminatory reason for firing Plaintiff, there are many facts surrounding the termination of Plaintiff's employment which overwhelmingly indicate that it was a pretext firing.

101.     Defendant's illegal retaliation against Plaintiff not only was designed to punish Plaintiff, but was also designed to send a clear message to all other department staff members that "this is what happens when you resist".  Defendant's retaliation against Plaintiff has had a chilling effect and interferes with individuals who would otherwise seek to exercise their rights in direct violation of 21 V.S.A. §§495 *et seq.*

102.     As a result of Defendant's retaliatory termination, Plaintiff has suffered substantial additional damages, on top of the uncompensated damages from the original discrimination charge.

## COUNT VIIII

## VIOLATION OF THE FAIR CREDIT REPORTING ACT ("FRCA")

## 15 U.S.C. §§ 1681 *et seq.*

1.  Plaintiff repeats each and all of the allegations set forth hereinabove.

2.  Defendant has acted willfully and with reckless indifference by engaging a collection agency to pursue debt that had been previously satisfied Plaintiff. Defendant reported Plaintiff's account to a Credit Reporting Agency (CRA) even though they have been notified several times that the debt was reported erroneously.

3. The collections agency and CRAs have both reported that the account was recently reported by UVMMCs billing department recently. Requests for verification establish this was not an error on the part of the collection agency, but it is at UVMMC's request.

4. Defendant's conduct, constitutes a willful abuse of the credit reporting system and the timing of such abuse indicates ongoing retaliation.

5. As a direct result of Defendant's willful and/or reckless violation of the FCRA Plaintiff has suffered and will continue to suffer economic damages and distress.

## REQUEST FOR RELIEF

WHEREFORE, while reserving the right to seek additional remedies and damages, Plaintiff, Amy Rooney, demands judgment against the defendant, The University of Vermont Medical Center, and respectfully requests relief as follows:

a) an permanent injunction enjoining UVMMC, its officers, successors, assigns and employees from engaging in discriminatory and retaliatory employment practices, and directing any other appropriate injunctive relief.

b) reinstatement of Plaintiff to the same position in the same department under different management, or alternatively an award of front pay, relocation and job search costs in lieu of reinstatement

c) an award of Plaintiff's actual compensatory damages for past in an amount to be determined at trial for loss of compensation & benefits (including shift differentials and incentive pay).

d) an award for damages in an amount to be determined at trial to compensate Plaintiff for loss of professional opportunities, loss of reputation, defamation, mental anguish, and emotional injury, and inconvenience.

e) an award of liquidated damages

f) an award for punitive damages

g) an award for reasonable attorney's fees and costs as incurred.

h) an award for pre and post-judgment interest, compensation for negative tax consequences

i) an award for any other appropriate relief as this Court deems just and proper

j)

## **DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all questions of fact in relations to all claims.

Dated at Burlington, Vermont this 6th, day of July, 2018.




AMY ROONEY, *pro se*

PO. Box 1710

Plattsburgh, New York, 12901

(518) 300-1203